Filed 8/27/13  P. v. Smith CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br>v.<br>PIERRE SMITH,<br>　　　Defendant and Appellant. | A133769<br><br>(Alameda County<br>Super. Ct. No. C166345) |
| In re PIERRE SMITH,<br>　　　on Habeas Corpus. | A137965 |

**BY THE COURT:**

The court on its own motion modifies the opinion, filed on August 1, 2013, as follows:

The third full paragraph of the disposition that begins with the words "Stephen B. Bedrick, defendant's counsel on appeal . . ." is deleted in its entirety.  In its place, the following paragraph is inserted:

"The Presiding Judge of the Alameda County Superior Court shall forthwith appoint counsel for petitioner to the extent required by California Rules of Court, rule 4.551(c)(2), cause all filings to be served on said counsel, and issue any appropriate orders for petitioner's transportation and personal appearance at the order to show cause hearing (Cal. Rules of Court, rule 4.551(f))."

This change does affect the judgment.


Dated:_____　　　　_____P.J.

Filed 8/1/13 (unmodified version)

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>PIERRE SMITH,<br><br>     Defendant and Appellant. | A133769<br><br>(Alameda County<br>Super. Ct. No. 166345) |
| In re PIERRE SMITH,<br><br>     on Habeas Corpus. | A137965 |

A jury convicted defendant Pierre Smith[1] of first degree murder. (Pen. Code, § 187, subd. (a).) The jury also found that defendant personally and intentionally discharged a firearm and caused great bodily injury (Pen. Code, §§ 12022.7, subd. (a), 12022.53, subd. (d)), that defendant personally and intentionally discharged a firearm (Pen. Code, § 12022.53, subd. (c)), and that defendant personally used a firearm (Pen. Code, §§ 12022.5, subd. (a), 12022.53, subds. (b), (g)). Defendant was sentenced to

---

[1] Throughout these proceedings, defendant has been referred to as Pierre Smith, although his real name apparently is Pierre Rushing. As the trial testimony brings out, defendant used a variety of nicknames, such as "Young Stank" and "Jewels." An issue discussed *post* is whether he was also referred to as "C."

1

prison for a term of 25 years to life for first degree murder plus an additional 25 years to life, to be served consecutively, for the use of a firearm.

Defendant timely appeals his conviction on several grounds. He claims that the trial court erred in admitting evidence of a prior uncharged act, in allowing the jury to use evidence of the uncharged act to prove malice and to evaluate his credibility, and in permitting a witness to testify that a person referred to as "C" committed the murder but to deny him the ability to identify the real "C." Defendant also contends that the prosecutor committed misconduct when he challenged defendant's credibility for denying he was "C" after having successfully objected to defendant presenting evidence of the identity of the real "C." We conclude the trial court improperly admitted evidence of defendant's uncharged offense but that the error was not prejudicial. Finding no other error, we shall affirm the judgment.

While his appeal was pending, defendant filed a petition for a writ of habeas corpus. We consolidated the writ petition with the pending appeal and requested that the People file an informal opposition to the petition. Although the allegations in defendant's petition fail to establish a prima facie case for relief on most of the issues raised, we conclude that the petition states a prima facie case for relief with respect to newly discovered evidence that suggests that defendant is factually innocent of the charges. Accordingly, we shall issue an order to show cause, returnable in the superior court, for the purpose of conducting an evidentiary hearing to determine the merits of the petition.

FACTS AND PROCEDURAL HISTORY

Of the 16 witnesses who testified at defendant's trial, only one witness, Robert Green, identified defendant as a participant in the killing. The following sequence of events is derived from his testimony.

2

*Green's testimony regarding the April 15, 2011, shooting*

In the early morning hours of April 15, 2011—between 3:30 and 3:45 a.m.—Green and Pat Smith (Smith)[2] arrived at an apartment building at 1406 77th Avenue in Oakland "to buy drugs." Green testified that he had previously accompanied Smith when he bought drugs from defendant at this same location, the first time a week or two before the incident. On that occasion, Green stated, he clearly observed defendant's face and heard his voice. Green had also seen defendant driving around the neighborhood in a grey sedan.

On the occasion in question, Green testified that he and Smith arrived at the apartment building in a red Volkswagen Jetta driven by Smith. Green stayed in the car while Smith went inside to buy the drugs. A few minutes later, Green saw a man, later identified as the victim, Dawonye Taylor, exit the building and walk down the street. Shortly thereafter, Smith and two men came out of the apartment building. Green identified one of the men as Andre, who he recognized "through buying drugs off him," and the third individual as defendant. Green testified that when he first saw defendant that night, his "name didn't click" but he recognized defendant "from somewhere." Later that night he remembered that defendant had introduced himself as "C" during their initial meeting. Green testified that defendant is in fact the person he knew as "C."

The three men got into the red Jetta. Defendant, wearing a black "puff coat," sat in the rear passenger seat behind Green. As the car took off in the direction Taylor was walking, defendant told someone on his cell phone "that somebody stole his iPod" and that "[he] shouldn't have left his iPod plugged up in the house." As the car approached Taylor, Green heard defendant say, "there he go right there" and defendant told Smith to "let him out of the car." Smith made a u-turn next to Taylor, stopping by a Giant Quarter-Pound Burger restaurant. Green testified that defendant and Andre got out of the car,

_____

[2] Three persons named Smith were involved in the facts of this case. None are related.

3

pinned Taylor against the passenger door, and began hitting and kicking him in the face and chest. Defendant accused Taylor of stealing his iPod. As Green turned to speak to Smith, a single gunshot was fired. Green turned and saw defendant "holding a gun towards" Taylor, "pointing [the gun] towards [Taylor's] stomach." Green stated, "it appear[ed] that [defendant] had his hand on the trigger." Defendant and Andre got back in the car and Smith drove off, leaving Taylor to die on the street.

DeCarla Smith (Carla) testified that as these events unfolded, she was standing at a bus stop two blocks away. She saw a red Volkswagen make a u-turn and pull in front of the Giant Burgers restaurant. She recognized the car as belonging to Smith because two weeks before she had been in the car with him. She recognized Smith as the driver of the car, and saw that there were three occupants. Carla testified that after the car parked, someone exited the car, confronted the victim, and then one gunshot was fired. About 15 to 20 minutes later, Carla crossed the street and identified the victim as "2." Carla acknowledged that she had previously given different accounts of the incident to the police because she did not want to be seen as a snitch. She said the "theory on the street is what you see you don't see" but swore that her trial testimony was truthful.

*Events leading to defendant's arrest*

On the following day, April 16, Green approached an Oakland police officer and asked to speak with him about the shooting the day before. Officer Steve Walker confirmed that Green had approached him and he gave Green's contact information to a homicide investigator, Steven Nowak. Green met with Nowak on April 21, 2011. Green testified that during this initial meeting, he was shown a photo lineup from which he identified Andre as one of the men in the car on April 15, but he was unable to identify the other two men. Green gave the officer a description of "C" as brown skinned, about 5 feet 10 inches tall, with short hair, 20 years old, and around 120 pounds with a slim build.

4

Green met with Nowak the next day, April 22, and identified Smith from a photo lineup, but was still unable to identify any photograph as a picture of "C."

On April 22, 2011, Officer Michele Melham spotted the red Jetta in a parking lot with Smith asleep in the front seat. Aware of the ongoing homicide investigation, Melham detained both Smith and the car. The car was dusted for fingerprints. Those of Smith, Green, and Carla were taken from the car, but no fingerprints of Andre or defendant were found.

On April 30, Green fortuitously saw defendant at a BART station wearing a red cap. He called Nowak and told him that he had just seen "C" and that his prior description of him was wrong, as the man had a darker complexion and was taller than he initially thought. Green told Nowak that his height was in fact 6 feet 2 inches. At trial, Green attributed his mistake to the fact that the night of the incident he was sitting in the car while defendant stood, so that he had no frame of reference.

While on patrol on May 3, 2011, Officer Michael Igualdo saw a man matching the description of the suspect from the April 15 shooting. This individual was a Black male, "tall, slim build, and young," and he was wearing a red cap.[3] Igualdo stopped the man, who identified himself as defendant. Later that day Igualdo went back to the 1400 block of 77th Avenue and observed defendant leaning against a grey sedan parked in close proximity to the 1406 77th Avenue apartment building.

On May 9, Nowak went to Green's residence and showed Green two new photo lineups. Green immediately identified photograph No. 4 as the person he knew as "C." At trial, Nowak testified that defendant is the person shown in photograph No.4. Based on this information, an arrest warrant was issued and defendant was arrested on May 20, 2011.

---

[3] The description of the suspect also included reference to a black jacket.

*Forensic pathologist and criminalist testimony*

A forensic pathologist testified that the victim had a grazing gunshot wound to the left shoulder. There was "an entrance-type gunshot wound, entrance meaning bullet going into the body. And this was located in the area of the left collar bone. There were also some scrapes on [the victim's] body, and these were located at . . . the right eye area." The pathologist said that the scrapes were consistent with being punched with a fist, although he could not confirm that was in fact the cause. The cause of death was a gunshot wound to the torso.

A criminalist with the Oakland Police Department also testified. He tested the victim's sweatshirt, focusing particularly on the upper left-hand shoulder area and what looked like a bullet hole. By examining the hole, the lead surrounding the hole, and residue gun powder left on the sweatshirt, the criminalist found that the hole was ragged and torn, indicating a "close, near contact or contact shot" and that the hole is a bullet hole made from sweatshirt-to-muzzle distance.

*Defendant's alibi*

Laura Richardson testified that she and defendant were friends and were also intimate. She testified that she was with defendant on April 14, 2011, recording a video in the park. Richardson said they went to the home of defendant's grandmother "late" that night, and stayed for four to six hours. She and defendant left his grandmother's house around the break of dawn the following morning, April 15, to get breakfast and she then dropped defendant off back at his grandmother's home. Richardson said she specifically remembered April 15th, as it was tax day and her mother "waits to the last day to do taxes"[4] and her son had a performance at school that afternoon. On cross-examination, Richardson testified that when she visited him in jail "[defendant] did tell [her] that he

---

[4] A juror pointed out that in 2011, April 15 was a holiday, so the last day to file taxes was the 18th.

was with [her] on the day that it was alleged that it happened, but . . . [i]t was not the main point of [their] conversation, and he did not sound nervous . . . ."[5] Richardson testified that she never thought to go to the police with the exculpatory information.

Defendant testified and denied any association with the victim, Green, Smith, or the nickname C. He testified that he had only limited contact with the 77th Avenue apartment building, but he also acknowledged that he sold marijuana at the apartment complex throughout 2010 and that he previously told Nowak that the apartment "was [his] house growing up." He testified that he stayed in the apartment when he needed money and that the apartment building appeared in his first rap music video.[6]

Defendant testified he was at his grandmother's house on April 15, 2011, at 3:30 a.m. He acknowledged, however, that when arrested he had told Officer Nowak something different. He had first told Nowak that he was at his father's house on April 15th. At trial he explained that he was there later in the day, around 11:00 a.m. for "only 15, 20 minutes" and that the "[the police officers] never made it specific on the time" and he thought they were referring to later in the day, and not 3:45 a.m. Nevertheless, defendant testified he was "deliberately lying to the police when [he] told them [he was] at [his] dad's house" and that even if the police officers had been specific as to the time of day, he "probably would have still lied because [he] knew [he] didn't know nothing about a murder." Later, defendant gave Nowak a second alibi, that he was in custody in San Jose from April 14 to April 16, 2011 and at trial admitted that this alibi was also

---

[5] Richardson testified that the main reason for visiting defendant in jail was to tell him that she was pregnant. She was positive defendant was the father, but she later suffered a miscarriage.

[6] This music video was entitled "Get that Dough." During cross-examination, the prosecutor asked defendant about the video's message, and defendant said the song is about how "I want to get money." The prosecutor then asked defendant if there were guns in the video, and defendant said "there is not a gun in that video." The video was played during trial, and guns were in fact featured throughout the video.

7

untrue.[7] Although having testified that April 15 was an important and memorable date for his family, he testified that his mind was racing during his interview with Nowak and he mixed up the dates. He was not arrested until the night of April 15.

Defendant testified that he had not previously told the police he was at his grandmother's home at 3:30 a.m. on April 15 because he did not want to involve his grandmother in a criminal investigation and for that reason had lied to the police officers.

*Uncharged offense admitted to prove intent and absence of mistake or accident*

Prior to the jury being empanelled, the court ruled on motions in limine, including the People's motion "to admit evidence under [Evidence Code section] 1101(b) regarding [defendant's] conduct that occurred on March 22nd of 2009." The prosecutor offered to prove that on the prior occasion defendant shot another man who he claimed owed him money, but that an attempted murder charge was dismissed when the victim refused to identify defendant at the preliminary hearing. This evidence was "solely offered to establish intent and the absence of mistake or accident in this case." The prosecutor argued that the two incidents were "very similar in terms of the claim of rights. And even right down to the confrontation with the victim that starts with a physical confrontation and ends with a shooting." Defendant objected, arguing that the two incidents differed in motive and plan, and that evidence of the uncharged offense was of limited probative value and would be extremely prejudicial. He argued, "I think that the . . . defense in the case is going to be misidentification and alibi," and although "technically all the elements may be an issue . . . it seems pretty clear to me that from the discovery and the

---

[7] Defendant testified that he left his grandmother's house for his father's house around 10:00 a.m. on April 15. After picking up two prostitutes and stopping quickly at his father's house, defendant said he went to San Jose to drop off one of the prostitutes. Defendant got into an altercation with a woman, who stabbed him in the forehead, but defendant was arrested. Defendant said he was released the following afternoon, April 16, in San Jose.

preliminary examination testimony that whoever [Green] sees, whoever he may be . . . probably committed the murder, that shooting somebody with a high caliber weapon in close range like that, . . . it doesn't leave much room to argue things like intent or mistake . . . [t]he court's decision should be made in relation to that given that the defense is not seriously going to contest what was the intent of the shooter."

The trial court ruled that evidence of the uncharged offense would be admitted because the evidence was "materially and substantially probative . . . to prove intent." The court explained, "It is the 2009 incident in San Francisco and the one here in Oakland alleged in this complaint. There are similarities, the least of which would be that I hit people and then I shoot them, and that's what I do. The bottom line, also, when you add to that similarity factor, is that defendant . . . alleged that the victim owed him money in the March '09 incident versus this one where it is alleged that he had his iPod." "The factors are certainly consistent and great between the two instances that would allow [the court] to conclude it is material, it is substantially probative and therefore should be allowed." With respect to Evidence Code section 352, the court considered the evidence to have more probative value than prejudicial effect. The court stated that the 2009 incident was "highly probative, highly relevant, highly material as it relates to intent and to show the absence of mistake." The evidence would not be unduly time-consuming or prejudicial because "[i]t would not take that much time, certainly, to have the witnesses brought forth from the '09 incident to testify, and it wouldn't confuse the jury because the instructions are very clear that they can only use it for certain matters and not for others."

Thus, at trial, Parree Foster was permitted to testify regarding the events of March 2, 2009. He told the jury that he sold drugs in downtown San Francisco for several dealers, including defendant. On this particular day, he owed defendant $15. At 8:00 p.m. on March 2, defendant approached Foster and said "you owe me some money." Foster told defendant he would get the money to him soon, but defendant hit Foster in the ear. Foster responded by striking defendant. Defendant walked away but soon returned. As he

9

approached Foster, defendant said, "Oh, you owe me some money; you deserve that, huh?" Defendant then reached into his pocket, walked into Foster, and shot Foster three times in the abdomen and once in the leg. When the police arrived and Officer Jason Robinson was collecting gun powder residue from defendant, Robinson testified that defendant stated: "I'm not going to lie, Officer. I ran up on the guy because he owed me some money. I heard shots. I'm from Oakland. I came out here to get my money." Defendant was charged with attempted murder of Foster and possession of a controlled substance. At the preliminary hearing, Foster denied knowing defendant or that he was involved in the shooting and the attempted murder charge was dropped. During his testimony in the present trial, defendant offered a different account of the 2009 incident. He testified that he went to San Francisco to confront Foster about a debt he owed a friend. He admitted jumping Foster with four other men, but claimed that someone else shot Foster. He told defense counsel that he found himself taking the rap for another individual.

## DISCUSSION

I. *The court erred in admitting evidence of the 2009 shooting but the error was harmless.*

Defendant contends the trial court erred in admitting evidence of the uncharged 2009 shooting. We agree with the trial court that there was sufficient similarity between the charged and uncharged acts to make evidence of the prior shooting relevant to prove intent and absence of accident or mistake. However, because these factors were undisputed—the only disputed issue being the identity of the shooter—the evidence should have been excluded as having little probative value and being highly prejudicial.

Evidence Code section 1101, subdivision (a)[8] states in pertinent part that "evidence of a person's character or a trait of his or her character . . . is inadmissible

---

[8] All further section references will be to the Evidence Code unless otherwise noted.

10

when offered to prove his or her conduct on a specified occasion." However, subdivision (b) of section 1101 permits "evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact" at issue such as "motive, opportunity, intent, preparation, plan, knowledge, identity, [or] absence of mistake or accident. . . ." (See also *People v. Lindberg* (2008) 45 Cal.4th 1, 22.) However, the admissibility of evidence for these purposes is subject to the limitation imposed by section 352, under which the trial court, "in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice . . ." (E.g., *People v. Ewoldt* (1994) 7 Cal.4th 380, 404.) The "decision whether to admit other crimes evidence rests within the discretion of the trial court." (*People v. Lindberg, supra,* at p. 23.) "On appeal, the trial court's determination of this issue, being essentially a determination of relevance, is reviewed for abuse of discretion." (*People v. Kipp* (1998) 18 Cal.4th 349, 369.)

Evidence of uncharged acts is admissible to prove identity, common plan or design, or intent "only if the charged and uncharged crimes are sufficiently similar to support a rational inference of identity, common design or plan, or intent." (*People v. Kipp, supra,* 18 Cal.4th at p. 369.) However, "[t]he least degree of similarity (between the uncharged act and the charged offense) is required in order to prove intent. [Citation.] . . . In order to be admissible to prove intent, the uncharged misconduct must be sufficiently similar to support the inference that the defendant ' " 'probably harbor[ed] the same intent in each instance.' " ' " (*People v. Ewoldt, supra,* 7 Cal.4th at p. 402.) "When the proponent offers the uncharged misconduct [for intent], the judge should not be unduly strict in evaluating the degree of similarity." (1 Imwinkelried, Uncharged Misconduct Evidence (2009) Degree of Similarity Required Between Uncharged and Charged Acts to Invoke Doctrine of Chances, § 5:08, p. 25.)

The trial court did not abuse its discretion in finding that the 2009 act and the charged act were sufficiently similar to prove intent and absence of mistake or accident.

11

The court described the 2009 incident with Foster as "the defendant confronted Mr. Foster . . . , alleging that [Foster] owed him money, that [defendant] then struck [Foster] first and then he shot [Foster]." The judge summarized the present act as "[defendant] confronted [the victim], [who] allegedly . . . [took] his iPod, . . . and then [defendant] hit [the victim] first and then he shot [the victim] . . . just from looking at the two [acts], . . . he confronted [the victim], he alleged he owed, he beat him up, and then he shot him." For the limited purpose of proving intent, this was sufficient. (See *People v. Walker* (2006) 139 Cal.App.4th 782, 804 [evidence that both victims were beaten in the face, resulting in bruising around the eyes, indicated a similarity between the two acts]; *People v. Roldan* (2005) 35 Cal.4th 646, 706, overruled on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22 [concealed weapon indicates commonality between two acts].) " '[W]hen the other crime evidence is admitted solely for its relevance to the defendant's intent, a *distinctive* similarity between the two crimes is often unnecessary for the other crime to be relevant. Rather, if the other crime sheds great light on the defendant's intent at the time he committed that offense it may lead to a logical inference of his intent at the time he committed the charged offense if the circumstances of the two crimes are substantially similar even though not distinctive.' " (*People v. Demetrulias* (2006) 39 Cal.4th 1, 16-17.) The same is true with respect to the absence of mistake or accident. Intent and absence of mistake or accident "[reflect] two ways of describing the same relevant issue, namely, that defendant performed the acts that killed [the victim] intentionally rather than accidentally." (*People v. Whisenhunt* (2008) 44 Cal.4th 174, 204.)

Although evidence of the 2009 uncharged shooting was relevant to show state of mind, the similarity between the charged and uncharged acts was insufficient to be probative of the identity of the shooter. "The greatest degree of similarity is required for evidence of uncharged misconduct to be relevant to prove identity." (*People v. Walker, supra*, 139 Cal.App.4th at p. 803.) The evidence was never offered for the ostensible

purpose of proving that defendant was the shooter and the Attorney General does not suggest that the evidence would have been admissible for this purpose. Nonetheless, in admitting the evidence, there was an unmistakable danger that the jury would improperly consider the evidence to show defendant's disposition to shoot others, supporting Green's testimony that defendant is the person who committed the murder in this case. "Evidence of uncharged offenses 'is so prejudicial that its admission requires extremely careful analysis. [Citations.]' [Citation.] 'Since "substantial prejudicial effect [is] inherent in [such] evidence," uncharged offenses are admissible only if they have *substantial* probative value.' " (*People v. Ewoldt, supra,* 7 Cal.4th at p. 404; *People v. Hendrix* (2013) 214 Cal.App.4th 216, 245.)

The probative value of the evidence concerning the 2009 shooting was minimal at most in this case. The defense was not that defendant did not intend to shoot Taylor, or that he accidentally did so, but that he was not the person who did the shooting. It is true, as the Attorney General argues, that a "[d]efendant's plea of not guilty put in issue all of the elements of the offenses, including his intent." (*People v. Balcom* (1994) 7 Cal.4th 414, 422-423.) Nonetheless, there are circumstances in which "if the jury found that defendant committed the act alleged, there could be no reasonable dispute that he harbored the requisite criminal intent." (*Id.* at p. 422.) In such situations, "evidence of defendant's uncharged similar offenses [to prove intent] would be merely cumulative on this issue" and "the limited probative value of the evidence of uncharged offenses, to prove intent, is outweighed by the substantial prejudicial effect of such evidence." (*Id.* at p. 423.) In such cases, there is "no need for the jury to hear inherently prejudicial other crimes evidence that evinced a propensity of violence." (*People v. Hendrix, supra,* 214 Cal.App.4th at p. 245.)

In *Balcom,* the evidence was that the defendant placed a gun at the victim's head, which was sufficiently compelling evidence of the defendant's intent, if believed, to render evidence of an uncharged similar offense unnecessary to prove intent, and the

13

value of the evidence for that purpose was outweighed by its substantial prejudicial effect. Precisely the same is true in the present case. The only evidence was that the shooter, standing next to Taylor, fired a single shot at his stomach and that Taylor died from a single "close, near contact or contact [gun]shot." The criminalist testified that the shot was "sweatshirt-to-muzzle distance." Green saw defendant within seconds after the shooting, aiming the gun at the victim's stomach, with his finger still on the trigger. As defense counsel put it in objecting to the admission of the other-crime evidence, there was not "much room to argue things like intent or mistake." Unlike the situation in *Whisenhunt*, where the defense offered evidence that the victim's injuries were inflicted accidentally (*People v. Whisenhunt, supra,* 44 Cal.4th at p. 204), the defense here consistently argued that its defense was that the prosecutor was charging the wrong person. Defense counsel made this clear in opposing the prosecution's in limine motion and his opening statement to the jury began: "In this case I expect the evidence will not prove beyond a reasonable doubt that [defendant] was the shooter who caused the death of Mr. Taylor on April 15th this year." These facts presented the strongest case for exclusion of the evidence of other crimes: "(1) the defendant has not affirmatively claimed accident and (2) the nature of the crime is such that accident would not be a plausible defense." (1 Edward J. Imwinkelried, Uncharged Misconduct Evidence (2009) Use of Uncharged Misconduct To Prove Elements of Mens Rea─Disproving Defendant's Claim That He or She Acted Accidentally, § 5:11, p. 40.)

Although we conclude that the trial court erred in admitting testimony concerning the 2009 shooting, whether this error was prejudicial presents a close question. The error was harmless if it is not reasonably probable that defendant would have received a better outcome had the evidence been excluded. (*People v. Watson* (1956) 46 Cal.2d 818, 836.) "We will only disturb the trial court's exercise of discretion under section 352 'when the prejudicial effect of the evidence clearly outweighed its probative value.' " (*People v. Hollie* (2010) 180 Cal.App.4th 1262, 1274.)

14

Defendant was identified as the shooter by only a single witness, Green, who was then on felony probation and actively used drugs. There was no tangible evidence linking defendant to the killing. Although several fingerprints were recovered from the vehicle in which the shooter was riding, none were those of defendant. Moreover, Green's initial description of "C" was inaccurate, albeit in relatively minor respects.

Nonetheless, Green declined to make an identification of the shooter when defendant's photograph was not included in the several photo lineups initially shown to him. However, when he fortuitously encountered defendant at a BART station, he immediately recognized him. When first presented with a collection of photos that included defendant's photograph, he instantly and unequivocally identified defendant. Green had seen defendant on prior occasions and had no apparent reason to falsely accuse him. And there were other corroborating circumstances. The testimony of Carla Smith and a video surveillance tape confirmed Green's version of the shooting. Although neither Carla nor the video tape identified the shooter, both support the reliability of Green's testimony. Green's identification of defendant was also confirmed by his testimony that he had previously seen the person he knew as "C" driving in a grey sedan, in combination with Officer Igualdo's testimony that he had observed defendant leaning on a grey sedan near the 77th Avenue apartment building. Indeed, the evidence linking defendant with the sale of drugs at the apartment building from which the killer and the victim emerged also tends to confirm the reliability of Green's identification.

Perhaps the most persuasive support of Green's testimony is defendant's acknowledgement that he gave the police two false accounts of his whereabouts at the time of the killing, before providing a third alibi for the first time at trial. Moreover, his single supporting alibi witness, Laura Richardson, professed confidence in her recollection of events on April 15 because that was supposedly the final day for paying taxes, when the final date in 2011 was in fact April 18. Still further, Richardson admitted that when she visited defendant in jail he told her that they were together on April 15.

And defendant admitted that even if he had not been confused in his initial accounts to the police, he would have lied because "he didn't know nothing about a murder." Taken together, defendant's repeated lies about his whereabouts strongly suggest a consciousness of guilt (see *People v. Maury* (2003) 30 Cal.4th 342, 399 [jury could reasonably infer that defendant's lies to the police reveal a consciousness of guilt]; CALJIC No. 2.03) and support the veracity of Green's testimony identifying him as the person who shot Taylor.

Considering the record as a whole, we conclude that the other evidence of defendant's guilt was sufficiently strong that exclusion of the 2009 act would not have produced a different outcome. (See *People v. Williams* (2009) 170 Cal.App.4th 587, 613.) Moreover, other factors that the court is to consider in evaluating potential prejudice also mitigate against such a finding. The amount of testimony concerning the uncharged act was not disproportionate to the volume of testimony devoted to the charged act, which minimizes possible prejudicial effects. (See *People v. Avitia* (2005) 127 Cal.App.4th 185, 194; 2 Imwinkelried, Uncharged Misconduct Evidence (2009) Direct appeal — Reversibility of error —Factors considered in deciding whether error was harmful, § 9:87, p. 282.)[9] The testimony describing defendant's uncharged acts was "no stronger and no more inflammatory than the testimony concerning the charged offenses." (*People v. Ewoldt, supra,* 7 Cal.4th at p. 405.) Furthermore, the court provided limiting instructions throughout the proceedings. (*People v. Scheer* (1998) 68 Cal.App.4th 1009, 1023 [limiting instruction inform the jury that it cannot consider the evidence for propensity purposes].) The court gave a limiting instruction before each witness who testified

---

[9] While 13 witnesses testified regarding the charged offense, the prosecution called only three witnesses, Foster and two responding officers, to recount the events of March 2, 2009. In a trial that lasted nine days, with witness testimony on seven of those days, the testimony of these witnesses was not disproportionately time consuming. Foster's testimony took a portion of a single afternoon session and the two officers both testified within a single morning session.

16

regarding the 2009 incident and reiterated the limiting instruction in the jury instructions at the close of the evidence. Given the number of instructions that were given and the clarity of the instruction, we must presume that the jury adhered to the admonitions. (*Ibid.*)

II. *The limiting instructions were proper.*

Defendant asserts numerous errors in the content of the court's instructions concerning the proper consideration of the uncharged offense. The court instructed the jury on this issue at the close of trial, in full, as follows: "The People presented evidence that the defendant committed another offense that was not charged in this case. [¶] You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant, in fact, committed the uncharged offense. Proof by the preponderance of the evidence is a different burden of proof than proof beyond a reasonable doubt. A fact is proved by the preponderance of the evidence if you conclude that it is more likely than not that the fact is true. [¶] If the People have not met this burden, you must disregard this evidence entirely. [¶] If you decide that the defendant committed the uncharged offense, you may, but are not required to, consider that evidence for the limited purpose of deciding whether or not: [¶] The defendant acted with malice aforethought in this case; or [¶] The defendant's alleged actions were the result of mistake or accident. [¶] In evaluating this evidence consider the similarity or lack of similarity between the uncharged offense and the charged offense. [¶] Do not consider this evidence for any other purpose except for the limited purpose of determining the defendant's credibility. [¶] Do not conclude from [this] evidence that the defendant has a bad character or is disposed to commit a crime. [¶] And if you conclude that the defendant committed the uncharged offense, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of murder or that the allegations that the defendant personally used a

17

firearm or personally and intentionally inflicted great bodily injury or death on Dawonye Taylor have been proved. The People must still prove the charge and allegations beyond a reasonable doubt. [¶] Now, prior to the defendant testifying, I instructed you that the testimony of Parree Foster, Sergeant Simon Kim, and Officer Jason Robinson could only be considered by you for the limited purpose of intent or the absence of mistake or accident. The defendant has testified. You may now consider that evidence for the additional purpose of determining the defendant's credibility."

Defendant contends this instruction erroneously permitted the jury to consider the other-crime evidence in determining whether he acted with malice aforethought, which he argues is not a permissible purpose under section 1101, subdivision (b). Although subdivision (b) does not specifically list malice, "the list is not exclusive." (*People v. Catlin* (2001) 26 Cal.4th 81, 146.) "The categories listed in section 1101, subdivision (b), are *examples* of facts that legitimately may be proved by other-crimes evidence." (*Ibid.,* italics added.) The list in section 1101, subdivision (b) explicitly allows evidence to prove motive and intent, which are states of mind, and malice clearly falls within the ambit of such proof. The concern is to preclude the use of such evidence to establish propensity, which is very different from proving that a defendant acted with malice aforethought. The court did not err in instructing that the evidence could be considered for that purpose.

Defendant also contends that it was error to instruct that the other-crime evidence could be used to evaluate defendant's credibility. Defendant is correct that section 1101, subdivision (b), does not authorize the use of uncharged acts for credibility purposes. But section 1101, subdivision (c), provides that "[n]othing in this section affects the admissibility of evidence offered to support or attack the credibility of a witness." (See *People v. Millwee* (1998) 18 Cal.4th 96, 130-131 [section 1101 does not preclude admissibility of evidence to show "implausibility and untruthfulness of defendant's testimony"].) And section 780 provides, "[e]xcept as otherwise provided by statute, the

18

court or jury may consider in determining the credibility of a witness any matter that has any tendency in reason to prove or disprove the truthfulness of his testimony at the hearing, including but not limited to any of the following: [¶] . . . [¶] (i) [t]he existence or nonexistence of any fact testified to by him." "[W]hen a defendant in a criminal prosecution takes the stand and denies his guilt he puts in issue his reputation for truth and honesty and thus subjects himself to the rules for testing credibility." (*People v. Taylor* (1986) 180 Cal.App.3d 622, 631.) The trial court properly found that "[w]hen the defendant got up and took the stand and . . . indicated there was a lack of culpability, he really did blow the door wide open for the testimony to be used for all purposes, particularly credibility." Indeed, elsewhere in his argument defendant acknowledges that "[i]t was, of course, proper for the jury to rely upon [defendant's] trial testimony regarding the prior San Francisco incident both for impeachment and to determine his credibility."

Defendant next argues that the instructions regarding the uncharged act allowed the jury "(i) to find the prior true by a preponderance of the evidence—rather than beyond a reasonable doubt—and (ii) then to use the truth of the prior to determine whether or not [defendant] was credible." "[A] reviewing court must consider the instructions as a whole to determine whether there is a reasonable likelihood the jury applied the instructions in an unconstitutional manner." (*People v. Loy* (2011) 52 Cal.4th 46, 74.) Here, the court instructed that if the jury concluded that defendant committed the other offense, "that conclusion is only *one factor* to consider along with all the other evidence. It is *not sufficient by itself* to prove that the defendant is guilty of murder. . . . The People must still prove the charge and allegations beyond a reasonable doubt." (Italics added.) The instructions state repeatedly that the People had the burden of proving every element of the charged offenses beyond a reasonable doubt. In *People v. Lindberg, supra,* 45 Cal.4th at page 35, our Supreme Court found no error in similar instructions to those given here. The court found "no reasonable likelihood that the

19

instructions as a whole led the jury to believe that the prosecution was not required to prove all elements . . . beyond a reasonable doubt." (*Ibid.*; see also *People v. Loy, supra,* 52 Cal.4th at p. 75.) Under the instructions given here, we similarly conclude that no reasonable jury could believe that the prosecution was not required to prove all elements of the crime beyond a reasonable doubt.

III. *The trial court did not erroneously refuse to permit defendant to identify "C."*

Defendant argues that the trial court violated his constitutional rights by prohibiting him from presenting evidence of the identity of the real "C." This contention fails for several reasons.

Defense counsel asked defendant, "Do you know anybody in your neighborhood who goes by the nickname of C?" Defendant responded "Yes." Counsel then asked, "What's that person's true name?" to which defendant responded, "I don't know." The latter answer was stricken after the prosecutor objected on the grounds of "relevance without foundation for third-party culpability." In chambers, the prosecutor explained, "[s]o my objection, I think this line of questioning is somehow trying to establish third-party culpability, and I don't think any kind of threshold has been met in order to get that evidence in." The court asked defense counsel, "is this where this is going, that somehow this is all a grave mistake and that is the other C who did this, not [defendant]?" Defense counsel responded, "Well, yes" and the court ruled, "Okay. Then there definitely would need to be a greater foundation shown than this. At this point I will sustain, you know, the objection at this point. If you lay a foundation, that's very different." The defendant offered no further testimony on this subject, and made no further offer of proof that the court rejected.

Thus, the only evidence presented was that defendant knew somebody else who used the nickname "C." This answer was not stricken. As to the identity of this supposed other person, defendant testified he did not know his name. Although the answer was

20

stricken, there can be little objection to striking the answer that defendant did not know the answer to the question. Beyond that, defendant made no further offer of proof. There was no attempt to present evidence identifying this supposed other person in some manner other than by name. Moreover, the court was correct in requiring a foundation for the admission of third-party culpability evidence. "[T]here must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime." (*People v. Hall* (1986) 41 Cal.3d 826, 833.) Defendant made no offer to provide such a foundation or to prove any facts tending to identify any other person as the perpetrator of the killing.

Section 354, subdivision (a) states: "A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous exclusion of evidence unless the court which passes upon the effect of the error or errors is of the opinion that the error or errors complained of resulted in a miscarriage of justice and it appears of record that: [¶] (a) [t]he substance, purpose, and relevance of the excluded evidence was made known to the court by the questions asked, an offer of proof, or by any other means." Therefore, "[a]s a condition precedent to challenging the exclusion of proffered testimony, [citation], . . . the proponent [must] make known to the court the 'substance, purpose, and relevance of the excluded evidence.' " (*People v. Ramos* (1997) 15 Cal.4th 1133, 1178.)

Although the court terminated counsel's line of questioning without a foundation, it did not rule on the admissibility of any proffered evidence. Neither the trial court nor this court can evaluate the admissibility of proposed evidence that is not properly described. An offer of proof " 'must set forth the actual evidence to be produced and not merely the facts or issues to be addressed and argued [citation]. The trial court may reject a general or vague offer of proof that does not specify the testimony to be offered by the proposed witness.' " (*Bowman v. Wyatt* (2010) 186 Cal.App.4th 286, 329; see also *People v. Pride* (1992) 3 Cal.4th 195, 237 [absent an offer of proof as to what the

testimony would have been, defendant has not preserved any challenge to its exclusion on appeal].) There is thus no basis to conclude that the trial court excluded any particular evidence, much less evidence that was admissible, and still less that the court's ruling deprived defendant of his constitutional rights.

Defendant argues alternatively that his attorney's failure to provide a proper offer of proof constituted ineffective assistance of counsel. However, in the absence of any indication of what evidence the attorney had to offer, and of the attorney's reasons for failing to make an offer, we are in no position to say that his performance amounted to constitutionally inadequate representation. Moreover, we certainly cannot say "that it is 'reasonably probable a determination more favorable to the defendant would have resulted in the absence of counsel's failings.' " (*People v. Stankewitz* (1990) 51 Cal.3d 72, 113.) Even if defendant had been able to produce evidence of another person named "C," that evidence would not have negated Green's positive identification of defendant as the shooter, regardless of whether he was called "C" or any of the other nicknames that the evidence showed he used from time to time (e.g. "Young Stank" or "Jewels").

IV. *The prosecutor did not commit misconduct in implying that defendant lied when he denied association with the nickname* "C."

Defendant also contends that the prosecutor committed misconduct because, after successfully preventing him from identifying the person who went by the nickname "C," the prosecutor attacked defendant's credibility by implying that he falsely denied that his nickname was "C."

" ' " It is settled that a prosecutor is given wide latitude during argument. The argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom." ' " (*People v. Thomas* (2012) 53 Cal.4th 771, 822.) It is up to the jury to decide whether the inference was in fact reasonable. (*People v. Hamilton* (2009) 45 Cal.4th 863, 928.)

22

The prosecutor stated the following in his closing argument: "Let's take the Parree Foster incident. This incident and that San Francisco incident share some remarkable similarities. Both Parree Foster and Robert Green knew the defendant for only a short time before this incident: once before in the case of Green twice before in the case of Foster. [¶] . . . [¶] Both knew him by a nickname that the defendant says was incorrect: Stay, in the case of Parree Foster and the defendant has testified, I should have corrected him. . . . Of course he is not going to correct him. What good is that going to do you? You can ask Pierre Smith about correcting somebody when they have got your name wrong or giving a false name when you are engaged in criminal activity. If someone has got your name wrong and you are engaged in criminal activity with that person, no sense in correcting. [¶] . . . [¶] The defendant is possibly identified as the shooter in both cases. . . . [¶] And the defendant's response to both incidents: Mistaken identity. Defendant wants you to believe lightning struck him twice. It is nonsense. The reality is that the defendant shot both men under very similar circumstances with the same intent."

The prosecutor's argument involved no misconduct. The situation here is very different from that in *People v. Frohner* (1976) 65 Cal.App.3d 94, on which defendant relies. In *Frohner*, the court found that the prosecutor committed misconduct when he allowed the jury to infer that the defendant purposely failed to call a witness when in fact the prosecutor had failed to take reasonable efforts to secure the witness. (*Id.* at p. 109.) Here the prosecutor made a proper objection to defendant's line of questioning; he was not responsible for the unavailability of any witness or other evidence defendant sought to produce and he did not misstate the facts. Defendant had denied that he went by the nickname "C" and he also denied going by the name "Stay," which evidence showed he had used at the time of the prior shooting. The prosecutor's comment on this evidence was not improper.

23

## V. *Cumulative Prejudice*

Having concluded that the trial court committed only a single error that was not prejudicial, we reject defendant's argument that, in combination with the other rulings that were not erroneous, there was a cumulative prejudicial effect requiring the reversal of his conviction. (*People v. Bell* (2007) 40 Cal.4th 582, 621.)

## VI. *Petition for Writ of Habeas Corpus*

Defendant's petition is based on numerous grounds. Insofar as the petition alleges prosecutorial misconduct and ineffective assistance of counsel based on the prosecutor's closing argument discussed in section IV, *ante*, we find no merit to those allegations. Likewise, we find no merit in the claim that the prosecution committed *Brady* error (*Brady v. Maryland* (1963) 373 U.S. 83) by failing to disclose Green's "Crime Stopper" reward or engaged in misconduct by arguing at trial that Green "had nothing to gain" by testifying against defendant. There is no indication in the allegations of the petition or the supporting exhibits that Green asked for or was promised the reward or knew prior to trial that he was likely to receive the reward for his testimony.

However, the petition is also based on a claim of factual innocence, supported by new evidence that requires an evidentiary hearing to evaluate its credibility and significance. An affidavit of codefendant Patrick Smith acknowledges that he was driving the car that was involved in the incident and that he witnessed the shooting, and it states that the crime was committed by a man he knew as "C" and defendant is not that man. Smith's testimony was unavailable at the time of trial because Smith was then exercising his constitutional privilege not to testify. Other purportedly newly discovered evidence includes the affidavit of Yolanda Washington in which she states that she was present in the apartment when "C" left to pursue Taylor and that "C" is Charles Lynn Dunn, Jr., not defendant. Also submitted are copies of defendant's cell phone records (indicating that defendant was not speaking on his cell phone at a point before the killing when Green

24

testified the person who shot the victim was speaking on his cell phone) and a report by Stuchman Forensics Laboratory following its enhancement of the security video shown at trial (which assertedly shows that details of Green's testimony were incorrect). If credited, the new evidence tends to indicate that defendant is factually innocent of the crime for which he has been convicted, and thus, establishes a prima facie case for relief. (*In re Lawley* (2008) 42 Cal.4th 1231, 1238; *People v. Duvall* (1995) 9 Cal.4th 464, 474.) The credibility of the new evidence, and its ultimate significance in view of the other evidence submitted at trial, must be determined by the trial court under governing habeas corpus standards, following an evidentiary hearing. (See *In re Lawley*, *supra,* 42 Cal.4th at pp. 1238-1241.)

DISPOSITION

The judgment is affirmed.

With respect to the petition for writ of habeas corpus, respondent is directed to show cause in the trial court why relief should not be granted with respect to petitioner's claim of factual innocence based on newly discovered evidence. (Cal. Rules of Court, rule 8.385(d), (e).) The trial court is directed to hold an evidentiary hearing and grant or deny relief based on the law and the court's determination of the facts.

Stephen B. Bedrick, defendant's counsel on appeal and in the proceedings on the petition for a writ of habeas corpus filed in this court, is appointed to represent defendant in any further proceedings on the habeas corpus petition. (Cal. Rules of Court, rule 4.551(c)(2).)

Respondent shall serve and file its return to the petition in the trial court within 30 days from the date of this order, petitioner may serve and file a traverse within 30 days thereafter, and the trial court shall hold the required evidentiary hearing as soon as practicable after the filing of the return and traverse.

_____
Pollak, J.

We concur:


_____
McGuiness, P. J.


_____
Siggins, J.